Scott H. SOUTHWORTH, Amy Schoepke, Keith Bannach, et al., Plaintiffs–Appellees, Cross–Appellants,

v.

Michael W. GREBE, Sheldon B. Lubar, Jonathan B. Barry, et al., Defendants–Appellants, Cross–Appellees.

Nos. 97–3510, 97–3548.

United States Court of Appeals, Seventh Circuit.

Submitted Feb. 26, 1998.*

Decided Aug. 10, 1998.

* This is a successive appeal to No. 97–1001, which was argued on June 14, 1997, and which we dismissed for lack of jurisdiction. *Southworth v.* *Grebe,* 124 F.3d 205 (7th Cir.1997) (unpublished order).

Jordan W. Lorence (submitted), Northstar Legal Center, Fairfax, VA, for Plaintiffs–Appellees, Cross–Appellants.

Susan K. Ullman, Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for Defendants–Appellants in No. 97–3510.

James E. Doyle, Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for Defendants–Appellees in No.97–3548.

David E. Wood, Fund for Public Interest Research, Incorporated, Madison, WI, for Amicus Curiae Wisconsin Student Public Interest Research Group, Incorporated, Associated Students of Madison.

Patricia M. Logue, Lambda Legal Defense and Education Fund, Midwest Regional Office, Chicago, IL, Ruth Harlow, Lambda Legal Defense and Education Fund, New York City, for Amicus Curiae Lesbian, Gay and Bisexual Campus Center at University of Wisconsin–Madison, Lambda Legal Defense & Education Fund, Incorporated.

Before BAUER, WOOD, Jr., and MANION, Circuit Judges.

MANION, Circuit Judge.

Students attending the University of Wisconsin–Madison must pay a student activity fee. A portion of this mandatory fee is distributed to private organizations which engage in political and ideological activities. Plaintiffs, students at the University of Wisconsin–Madison, sued the Regents of the University claiming that forcing objecting students to fund such organizations violates their First Amendment rights, as well as other federal and state statutes. After various procedural motions and argument, the district court granted plaintiffs summary judgment on their freedom of speech and association claims, dismissed the remaining claims, and entered an injunction which both barred such funding and established a detailed opt-out mechanism. We affirm the district court's determination that forcing objecting students to fund private organizations which engage in political and ideological activities violates the First Amendment, but reverse and vacate portions of the declaratory judgment and injunction.

## I. BACKGROUND

### A. Procedural and Factual Background

Plaintiffs Scott Southworth, Amy Schoepke, Keith Bannach, Rebecca Bretz, and Rebecka Vander Werf each attended or still attend the University of Wisconsin–Madison. They sued the members of the Board of Regents of the University of Wisconsin System ("the Regents"), claiming that the Regents' use of objecting students' mandatory student activity fees to fund private organizations that engage in political and ideological advocacy, activities, and speech violates their rights of free speech and association,

the Free Exercise clause of the Constitution, the Religious Freedom Restoration Act, ("RFRA"),[1] and various state laws. They sought both injunctive and declaratory relief.

The district court granted plaintiffs summary judgment on their free speech and free association claims, and the Regents appealed. We dismissed the original appeal as impermissibly interlocutory, and remanded to the district court. *Southworth v. Grebe*, 124 F.3d 205 (7th Cir.1997) (unpublished order). Following various interim procedural refinements—none of which merit discussion here—the district court dismissed the remaining claims and granted the plaintiffs injunctive relief.

This successive appeal followed. Because extensive briefing and argument on the merits of this case have already occurred, we instructed the parties to limit their additional briefing to the district court's decision on remand. We have reviewed these new briefs and the record, and conclude that additional oral argument on those issues is unnecessary, Fed. R.App. P. 34(a), Cir. R. 34(f). We now proceed to the merits, which include only the plaintiffs' First Amendment challenge to the Regents' mandatory student activity fee policy.

## B. Mandatory Student Fee Policy

Students enrolled full-time at the University of Wisconsin–Madison must pay a mandatory student activity fee; it's mandatory because students who refuse to pay cannot receive their grades or graduate. During the 1995–96 academic year (the academic year during which the plaintiffs filed suit) the Regents assessed a mandatory student fee of $165.75 each semester.

Section 36.09 of the Wisconsin Code gives both the Regents and the students control over the funds generated by the mandatory student fee. The extent of control depends on the classification given the student fees: The Regents classify a portion of the student

fees as nonallocable and a portion as allocable. Although the students (through student government representatives) review and make recommendations regarding the use of nonallocable fees, the Regents control the distribution of these fees. (The nonallocable fees cover expenses such as debt service, fixed operating costs of auxiliary operations, student health services, and the first and second year of the Recreational Sports budget.) On the other hand, the Associated Students of Madison ("ASM") (the official representative of the student body) has complete authority over most of the allocable funding. Because the plaintiffs challenge only the funding from the allocable portion of student fees, we focus on those expenditures.

The distribution network for allocable student fees is rather complicated. We will attempt to draw the money trail to help explain the source of the complaint. As just noted, the ASM has authority over the allocable portion of student fees. Among other things, these fees fund the General Student Service Fund ("GSSF") and the Associated Students of Madison budget. In turn, both the GSSF and the ASM distribute the mandatory student fees to other private organizations, although the distribution process differs. The GSSF is distributed to private organizations by a committee of the ASM called the Student Services Finance Committee ("SSFC").[2] Registered student organizations, University departments, and community-based service organizations qualify for funding from the GSSF. To obtain money from the GSSF, the organization must apply to the SSFC. After reviewing the application, the SSFC determines whether to grant or deny the request for money, and if granted the SSFC also determines the amount of funding the private organization will receive. During the 1995–96 school year, the SSFC distributed about $974,200 in student fees to private organizations.

The ASM budget also funds private organizations, although only "Registered Student

---

1. The Supreme Court declared the RFRA unconstitutional in *City of Boerne v. P.F. Flores, Archbishop of San Antonio,* — U.S. —, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

2. Because of the need to abbreviate the various student groups by letters/acronyms, we insert for convenient reference: ASM—Associated Students of Madison; GSSF—General Student Service Fund; SSFC—Student Services Finance Committee.

Organizations" qualify for funding from the ASM budget. To qualify as a Registered Student Organization, among other things, a group must be a formalized not-for-profit group, composed mainly, but not necessarily exclusively, of students, and controlled and directed by students. A Registered Student Organization may obtain money from the ASM budget in the form of a grant to support its operations, related travel, or to sponsor an event. During the 1995–96 school year, the ASM budget distributed $109,277 in student fees to private organizations.

In addition to obtaining money from the GSSF and the ASM budget, a Registered Student Organization may seek funding through a student referendum. With a student referendum, students vote at large on whether or not to approve an assessment for the student group. The Wisconsin Student Public Interest Research Group ("WISPIRG") obtained $49,500 in student fees during the 1995–96 academic year as the result of a student referendum.

After the ASM and the SSFC (or the students by referendum) have made their funding decisions, these decisions are sent to the Chancellor and the Board of Regents for their review and approval; while the ASM has complete authority over most of the allocable funding, the Regents have final authority to approve or disapprove the allocations of funds by the student government under section 36.09(5) of the Wisconsin Code.

## C. Organizations Funded by the Student Fees

The GSSF, the ASM budget, and student referendums can fund many different activities and organizations. However, the plaintiffs object only to the funding of organizations which engage in political and ideological activities with fees collected from students who object to such funding. (Henceforth we shall refer to them as "objecting students.") Plaintiffs presented evidence of eighteen organizations which both receive student fees and engage in political and ideological activities: WISPIRG; the Lesbian, Gay, Bisexual Campus Center; the Campus Women's Center; the UW Greens; the Madison AIDS Support Network; the International Socialist Organization; the Ten Percent Society; the Progressive Student Network; Amnesty International; United States Student Association; Community Action on Latin America; La Colectiva Cultural de Aztlan; the Militant Student Union of the University of Wisconsin; the Student Labor Action Coalition; Student Solidarity; Students of National Organization for Women; MADPAC; and Madison Treaty Rights Support Group.

Reviewing the evidence in the light most favorable to the Regents, as we must, we conclude that the 18 organizations listed above both receive student fees and engage in political and ideological activities. While the record is replete with examples, we limit ourselves to a sample:

WISPIRG, which received $49,500 in student fees during the 1995–96 school year, distributed $2,500 directly to its parent organization U.S. PIRG for use in lobbying Congress and developing candidate-voter guides. WISPIRG also published a voters' guide, which ranked congressional candidates based on their views on various pieces of federal legislation. During 1995–96, the UW Greens received $6,905 in student fees. The UW Greens, along with the Progressive Student Network (another group funded with student fees), lobbied the Wisconsin state legislature, and encouraged legislators to introduce three bills which would limit mining in the state. The UW Greens also distributed literature for the Green Party USA, a political party, and distributed campaign literature for Ralph Nader during his bid for U.S. President on the Green Party ticket. Along with WISPIRG and other groups, the UW Greens also organized a march on the state capital to show their opposition to the governor and the governor's budget.

Another recipient of mandatory student fees, the International Socialist Organization, advocated the overthrow of the government: "Revolution Not Reform. Reforms within the capitalist system cannot put an end to oppression and exploitation. Capitalism must be overthrown. The structures of their present government—parliaments, the army, the police and capitalism—cannot be taken over and used by the working class." Along with the UW Greens and other groups, the

International Socialist Organization sponsored a rally at the state capitol and at a congressman's office. The International Socialist Organization also joined with about 400 others to demonstrate outside a church located in Madison to oppose the ideological views of a church speaker.

The Campus Women's Center, which received $34,200 in student fees, used its bimonthly newsletter to advocate its political and ideological views. For instance, in the February/March 1996 issue of "The Source," the newsletter published a lengthy article opposing the Informed Consent Bill (Assembly Bill 441), which proposed certain regulations of abortion. This article urged people to contact the Campus Women's Center to learn how they could work against this legislation:

> We must act now to block this bill. You can obtain a copy of the bill at the Legislative Reference Bureau. Familiarize yourself with its contents and get prepared to defend women's rights to reproductive choice when the bill hits the Senate Floor in March. For more information or to find how you can become further involved, contact Jennifer at the Campus Women's Center: 262–8093.

Other examples include the Ten Percent Society which in its funding application stated that it has "also been active in the political arena as necessary." The Ten Percent Society received funding and used its Internet Home Page to advocate legislation authorizing same-sex marriages, while condemning attempts by the Wisconsin Legislature to ban them. The Progressive Student Network and Amnesty International also received student fees: The Progressive Student Network focused on a variety of issues including "free trade (NAFTA/GATT), welfare reform, ... right-wing backlash on campus, the GOP's 'contract with America,' etc...." And Amnesty International worked publicly for the abolition of the death penalty.

The defendants do not dispute that these and other organizations engage in political and ideological speech. Instead, the Regents argue that the First Amendment protects the rights of these organizations to engage in such speech. Of course it does. But the students do not ask that we restrict the speech of any student organization; they merely ask that they not be forced to financially subsidize speech with which they disagree. In other words, Amnesty International is free to oppose the death penalty and can continue to advocate its position; the Women's Resource Center can still speak out against informed consent legislation; and the UW Greens, the International Socialist Organization and WISPIRG can lobby all they want. The Regents and amici rely on the First Amendment's guarantee of free speech as support for their position, but the First Amendment does not guarantee that the government will subsidize speech. *See, Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 256 n. 9, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("[T]here is no right to have speech subsidized by the Government."). In short there is absolutely no question here of restricting the speech of any private organization. *See, e.g., Smith v. Regents of the University of California*, 4 Cal.4th 843, 16 Cal.Rptr.2d 181, 844 P.2d 500, 503 (1993) ("In fact, the case has nothing to do with restrictions on speech. It goes without saying that all students are free to organize, to promote their ideas, and to seek by all legal means to persuade others that their views are correct...").

Other aspects of the mandatory student fee which the students do not challenge include: the Regents' authority to collect student activity fees; the Regents' use of the non-allocable portion of the student activity fee; the Regents' use of the allocable portion of the student activity fee to fund the student government; the Regents' use of the allocable portion of the student activity fee to fund private organizations which do not engage in political or ideological speech, activities, or advocacy; the Regents' use of the allocable portion of *non-objecting* students' activity fees to fund private organizations engaging in political or ideological speech, activities, or advocacy; or the Regents' use of the allocable portion of the student activity fee to fund the student newspaper, or the Distinguished Lecture Series.

This leaves a very limited constitutional question: whether the Regents can force objecting students to fund private organizations which engage in political and ideological activities, speech, and advocacy. The district court concluded that they could not, and granted the plaintiffs declaratory and injunctive relief. We begin by considering the declaratory relief.

## II. ANALYSIS

### A. Declaratory Judgment

■ The district court entered a declaratory judgment that "the defendants' use of the mandatory segregated fees to support political and ideological activities violates the First Amendment to the United States Constitution, ..." The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridge the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for redress of grievances.

The Supreme Court has long recognized two necessary corollaries to the First Amendment's guarantee of free speech: the right not to speak, *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); and the right not to be compelled to subsidize others' speech, *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Keller v. State Bar of Cal.*, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). It is based on these familiar corollaries, and specifically *Abood* and *Keller*, that the plaintiffs challenge Wisconsin's mandatory student fee policy.

The Supreme Court has yet to determine whether these First Amendment corollaries protect objecting students from being forced by state universities to subsidize private political and ideological organizations. However, in *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 115

S.Ct. 2510, 132 L.Ed.2d 700 (1995), the Supreme Court provided guidance on the appropriate analysis for such a challenge. In *Rosenberger*, students who published a Christian newspaper at the University of Virginia challenged the university's denial of their request for funding from the university's mandatory student activity fees. Although the university had used student fees to pay for printing costs for nonreligious newspapers, the university denied the plaintiffs' request because of the newspaper's religious viewpoint. *Id.* at 825–27, 115 S.Ct. 2510. The Supreme Court held that the student activity fees created a forum of money and that once established the forum had to be made available on a viewpoint-neutral basis. Because the University of Virginia discriminated based on the religious viewpoint of the newspaper, it had violated the First Amendment.

While *Rosenberger* did not consider the question we have before us, in noting what was not before it, the Court directed us to the *Abood* and *Keller* analysis:

> The fee is mandatory, and we do not have before us the question whether an objecting student has the First Amendment right to demand a pro rata return to the extent the fee is expended for speech to which he or she does not subscribe. *See Keller v. State Bar of California*, 496 U.S. 1, 15–16, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990); *Abood v. Detroit Board of Ed.*, 431 U.S. 209, 235, 236, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).

*Id.* at 840, 115 S.Ct. 2510. *See also, Rosenberger,* 515 U.S. at 851, 115 S.Ct. 2510 (O'Connor, concurring) ("Finally, although the question is not presented here, I note the possibility that the student fee is susceptible to a Free Speech Clause challenge by an objecting student that she should not be compelled to pay for speech with which she disagrees. *See, e.g., Keller v. State Bar of California*, 496 U.S. 1, 15, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990); *Abood v. Detroit Board of Education*, 431 U.S. 209, 236, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).").[3]

---

**3.** The Regents try to shoehorn this case into *Rosenberger*. However, as the Court made abundantly clear, it considered only the disbursement of student activity fees; it did not consider the constitutionality of forcing students to fund pri-

Not only does *Rosenberger* direct us to *Abood* and *Keller*, but every other circuit to have considered the constitutional uses of mandatory student activity fees has applied the *Abood* and *Keller* analysis (although the circuits are split on how exactly the analysis applies). *Galda v. Rutgers,* 772 F.2d 1060, 1063–64 (3d Cir.1985); *Carroll v. Blinken,* 957 F.2d 991, 997 (2d Cir.1992); *Hays County Guardian v. Supple,* 969 F.2d 111, 123 (5th Cir.1992); *Kania v. Fordham,* 702 F.2d 475, 479–80 (4th Cir.1983). *See also, Smith v. Regents of the University of California,* 4 Cal.4th 843, 16 Cal.Rptr.2d 181, 844 P.2d 500, 511 (Cal.1993) (applying the *Abood* and *Keller* analysis). Given the Supreme Court's lead and the overwhelming authority from other circuits, the issue before us is properly reviewed under the authority of *Abood* and *Keller.*

In *Abood,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261, employees of the Detroit Board of Education challenged the constitutionality of an agency-shop agreement which required teachers who did not join the union to pay a service fee to the union. The teachers argued that this mandatory fee violated their First Amendment rights to free speech and free association. The Supreme Court held that the Board of Education could compel non-union teachers to pay the service fee, explaining that "such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." *Id.* at 222, 97 S.Ct. 1782. Thus, so "long as [the union] act[s] to promote the cause which justified bringing the group together, the individual cannot withdraw his financial support merely because he disagrees with the group's strategy." *Id.* at 223, 97 S.Ct. 1782.

The Court continued, clarifying its holding: We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes *not germane* to its duties as collective-bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment.

*Id.* at 235–36, 97 S.Ct. 1782 (emphasis added).

Thirteen years later in *Keller v. State Bar of California,* 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990), the Supreme Court revisited the issue of compelled funding. In *Keller,* a group of lawyers challenged the use of mandatory state bar dues to fund lobbying on social issues. The Supreme Court began by explaining *Abood:*

*Abood* held that unions could not expend a dissenting individual's dues for ideological activities not *germane* to the purpose for which compelled association was justified: collective bargaining. Here the compelled association and integrated bar are justified by the State's interest in regulating the legal profession and improving the quality of legal services. The State Bar may therefore constitutionally fund activities germane to those goals out of mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity.

*Id.* at 13–14, 110 S.Ct. 2228.

From *Keller's* holding ("The State Bar may therefore constitutionally fund activities *germane* to those goals....", 496 U.S. at 13, 110 S.Ct. 2228) and *Abood's* qualification (the Constitution requires that expenditures for ideological cause *not germane* be financed by voluntary funds, 431 U.S. at 235, 97 S.Ct. 1782), courts have named the analysis born of *Abood* the "germaneness analysis." [4] Yet *Abood* did not provide much guid-

---

vate political and ideological organizations. *Rosenberger,* 515 U.S. at 840, 115 S.Ct. 2510.

**4.** Actually, the concept of "germaneness" derived from *Railway Employees v. Hanson,* 351 U.S. 225, 235, 76 S.Ct. 714, 100 L.Ed. 1112 (1956),

wherein the Supreme Court held that only expenditures "germane to collective bargaining" were chargeable to dissenting employees under the Railway Labor Act (as opposed to the First Amendment).

ance as to its actual application. *Keller* did more by setting forth guidelines for determining permissive expenditures: "[T]he guiding standard must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service available to the people of the State.'" *Id.* at 14, 110 S.Ct. 2228 (quoting *Lathrop v. Donohue,* 367 U.S. 820, 843, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961) (plurality opinion)). But *Keller* still left many lines to be drawn.

■ Beyond *Abood* and *Keller,* the Supreme Court has addressed the issue of germaneness in several other cases. *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Ellis v. Brotherhood Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984); *International Ass'n of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). The most significant development came in *Lehnert v. Ferris Faculty Assn.,* 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991). In *Lehnert,* the Supreme Court considered the constitutionality of various union expenditures under the germaneness analysis originating in *Abood* and *Keller.* However, in doing so, *Lehnert* explained that this required a three-prong analysis for determining whether union expenditures violated the objecting employees' First Amendment rights: To be constitutional, the expenditure must be "germane to collective bargaining; justified by the government's vital policy interest in labor peace and avoiding 'free-riders'; and not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop." *Id.* at 519, 111 S.Ct. 1950. The Supreme Court recently reaffirmed this test. *Air Line Pilots Assoc. v. Miller,* —— U.S. ——, 118 S.Ct. 1761, 140 L.Ed.2d 1070 (1998).

*Lehnert's* three-prong analysis is the test today. And as *Lehnert* holds, there is more to the germaneness analysis than whether the activity is germane to the governmental interest, but because "germaneness" is the first prong, we begin there.

### 1. Germaneness.

Under *Lehnert,* the first prong considers whether the mandatory fee is germane to some otherwise legitimate government scheme, in that case collective bargaining. This prong really presents two questions: initially whether there is some otherwise legitimate governmental interest justifying any compelled funding; and then whether the specifically challenged expenditure is germane to that interest. We need not answer the initial question because the students do not contend that the Regents lack a legitimate interest in the compelled funding of the student government or student organizations.

That leaves the second question: whether the challenged activity is germane to the government's asserted interest. Here the Regents assert an interest in education. They then contend that funding private organizations which engage in political and ideological activities is germane to education because the funding allows for more diverse expression and this in turn is educational. *See reply brief* at 2 ("[E]xpression of diverse viewpoints is germane to the educational mission of the UW–Madison.").

However, "germaneness" cannot be read so broadly as to justify the compelled funding of private organizations which engage in political and ideological advocacy, activities and speech. For example, in *Keller,* the State Bar defended its funding of lobbying on nuclear weapons, abortion, and prayer in public schools arguing that it was authorized to fund activities "in all matters pertaining to the advancement of the science of jurisprudence or to the improvement of the administration of justice." 496 U.S. at 15, 110 S.Ct. 2228. The Supreme Court rejected such an over-encompassing reading of germaneness, holding instead that expenditures "to endorse or advance a gun control or nuclear weapons freeze initiative," clearly fell at "the extreme end[ ] of the spectrum" of expenditures not germane and therefore unconstitutional. *Id.* at 15–16, 110 S.Ct. 2228.

In *Lehnert* the Supreme Court again rejected a broad interpretation of "germaneness." *Lehnert* involved a challenge to the union's use of dues to fund lobbying related to financial support of the employee's profes-

sion or public employees generally. The Court held that "[w]here, as here, the challenged lobbying activities relate not to the ratification or implementation of a dissenter's collective bargaining agreement, but to financial support of the employee's profession or of public employees generally, the connection to the union's function as bargaining representative is too attenuated to justify compelled support by objecting employees."[5] 500 U.S. at 520, 111 S.Ct. 1950 (plurality). The Court further concluded "that the State constitutionally may not compel its employees to subsidize legislative lobbying or other political union activities outside the limited context of contract ratification or implementation." *Id.* at 522, 111 S.Ct. 1950 (plurality).

In these cases, the Supreme Court rejected arguments that political and ideological speech is germane to the governmental interest involved. In fact, in *Lehnert*, the Supreme Court stated that germaneness cannot be read so broadly in the context of a private sector union as to *"include political or ideological activities."* *Id.* at 516, 111 S.Ct. 1950 (emphasis added). *See also, Ellis*, 466 U.S. at 452, 104 S.Ct. 1883 (holding that while union activities in question may benefit collective bargaining, the benefits were too attenuated to be germane).

Similarly, here germaneness cannot be read so broadly as to include forced funding of private political and ideological groups. The private groups are voluntary and may be open to both students and non-students alike. Many of the groups mirror organizations which exist outside of the University setting (for example, WISPIRG, the UW Greens, the International Socialist Organization, and Amnesty International all have non-university counterparts). And most of the private student groups (over 70%) do not even apply for funding, showing that the funding is not even

germane to the private organizations' existence, much less germane to education. Moreover, unlike, for example, a political science class on socialism, the International Socialist Organization is only incidentally concerned with education. Its primary goal is the promotion of its ideological beliefs. The fact that some educational benefit may come from it is secondary, and therefore not sufficiently germane to overcome the objecting students' constitutional rights. The mere incantation of the rubric "education" cannot overcome a tactic, repugnant to the Constitution, of requiring objecting students to fund private political and ideological organizations.

To justify compelling objecting students to fund the private organizations, the Regents point to the expansive governmental interest they have-education—as compared to the limited interests involved in *Abood* and *Keller*—collective bargaining and oversight of the bar—and argue that because the interest is so broad, more activities are germane, including political and ideological activities. The Regents correctly recognize the breadth of "educational"; everything is in a sense educational (organizing a student activity, engaging in political and ideological speech, even choosing which political party or candidate to fund) even if it merely teaches you that you do not want to do it again. Yet when presented with a similarly expansive interest in *Keller*—the advancement of the law—the Supreme Court rejected such a broad reading of germaneness. *Keller*, 496 U.S. at 15–16, 110 S.Ct. 2228 ("[T]o endorse or advance a gun control or nuclear weapons freeze initiative," clearly fell at "the extreme end[ ] of the spectrum" of expenditures not germane and therefore unconstitutional.). We therefore reject the Regents' argument.

The Regents also rely on *Carroll v. Blinken*, 957 F.2d 991 (2d Cir.1992) ("*Carroll I*"),

---

**5.** In *Lehnert*, five justices adopted the three-prong analysis set forth above, although only four of those five justices agreed on the application of the factors; four justices believed that the challenged lobbying was not germane to collective bargaining, while one justice thought that it was. That is nonetheless the Court's holding. *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds' ....") (internal citation omitted). The remaining four justices also concluded that the lobbying activities could not be financed, but applied a "statutory duties test" instead of the three-prong analysis. *Lehnert*, 500 U.S. at 558, 111 S.Ct. 1950 (Scalia, concurring in part, dissenting in part).

and *Carroll v. Blinken*, 42 F.3d 122 (2d Cir. 1994) ("*Carroll II*"), wherein the Second Circuit applied the "germaneness" analysis of *Abood* and *Keller* and held that a state university could constitutionally fund the New York Public Interest Research Group with students' activity fees even though some students disagreed with that speech "as long as that organization spends the equivalent of the students' contribution on campus and thus serves the university's substantial interests in collecting the fee." [6]  957 F.2d at 992. The plaintiffs respond by citing the contrary precedent of *Galda v. Rutgers*, 772 F.2d 1060 (3d Cir.1985), wherein the Third Circuit applied the *Abood* and *Keller* "germaneness" analysis, and concluded that while the New Jersey Public Interest Research Group offered some educational benefits to students, such benefits were incidental to the organization's primary political and ideological purpose, and this incidental educational benefit did not justify the infringement of the dissenting students' speech and association rights:

> Although the training PIRG members may receive is considerable, there can be no doubt that it is secondary to PIRG's stated objectives of a frankly ideological bent. To that extent the educational benefits are only "incidental"—arising from or accompanying the principal objectives—and subordinate to the groups' function of promoting its political and ideological aims.

*Galda*, 772 F.2d at 1065.

The students also rely on the California Supreme Court decision in *Smith v. Regents of the University of California*, 844 P.2d 500, *cert. den.*, 510 U.S. 863, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993), which followed *Galda* and rejected *Carroll*. In *Smith*, students at the University of California at Berkeley challenged the school's mandatory activity fee which financed the student government and

other student activity groups. The students claimed that using their fees to subsidize private organizations which engaged in political or ideological activities violated the First Amendment. The California Supreme Court held that:

> The principles that we derive from *Carroll* and *Galda*, as well as *Keller* and *Abood*, are these: A university may, in general, support student groups through mandatory contributions because that use of funds can be germane to the university's educational mission. At some point, however, the educational benefits that a group offers become incidental to the group's primary function of advancing its own political and ideological interests. To fund such a group may still provide some educational benefits, but the incidental benefit to education will not usually justify the burden on the dissenting students' constitutional rights. Phrased in terms of the tests that courts have applied, a regulation that permits the mandatory funding of such groups is not "narrowly drawn to avoid unnecessary intrusion on freedom of expression" and it "unnecessarily restrict[s] constitutionally protected liberty, [when] there is open a less drastic way of satisfying its legitimate interest."

*Id.* 844 P.2d at 511 (internal citations omitted).

Were we to have to decide based solely on *Carroll*, *Galda*, and *Smith*, we would find *Galda* and *Smith*'s analyses and conclusions more persuasive, and we would conclude that funding of political and ideological speech of private organizations is not germane to the university's mission.[7] But our decision is not confined to lower court analyses. Rather, we have the Supreme Court's guidance on interpreting "germaneness," and the Court's example, see supra 724–26, counsels

---

**6.** *Carroll I* required that NYPIRG "spend[ ] the equivalent of the students' contribution on campus," 957 F.2d at 1002, while *Carroll II* refined the holding to require that NYPIRG spend the equivalent on "activities that foster a 'marketplace of ideas' on the [State University of New York] campus; (2) activities that provide SUNY Albany students with hands-on educational experiences; and (3) extra-curricular activities for SUNY Albany students, both on and off the Alba-

ny campus, that fulfill SUNY educational objectives." 42 F.3d at 128.

**7.** *Galda* (and *Carroll* for that matter) involved limited challenges to compelled funding of PIRG, and did not address the specific question presented here. 772 F.2d at 1064. Nonetheless, we believe the same analysis should govern private student organizations.

against adopting the broad reading of "germaneness" which *Carroll* took. However, even if germaneness could be read as broadly as the Regents suggest and the Second Circuit allowed, and we (along with the Third Circuit and the California Supreme Court) are wrong in our assessment of the germaneness of a University's funding of private political and ideological groups to education, the Regents would be less than halfway home. As *Lehnert* made clear, "germaneness" is not the be-all/end-all question in. the constitutional analysis, but rather is only the first prong: Under *Lehnert*, not only must the mandatory fee be germane to some otherwise legitimate economic or regulatory scheme, the compelled funding must also be justified by vital interests of the government, and not add significantly to the burdening of free speech inherent in achieving those interests. Yet *Carroll* did not consider these additional requirements, and in a case such as this involving the forced funding of political and ideological speech, those factors obtain the utmost significance.[8]

### 2. *Vital policy interests of the government.*

The second prong under *Lehnert* considers whether the compelled fee is justified by vital policy interests of the government. *Lehnert,* 500 U.S. at 520, 111 S.Ct. 1950. In the context of unions, those policy interests included both labor peace and avoiding free riders, and with the bar "the state's interest in regulating the legal profession and improving the quality of legal services" justified the compelled association inherent in the integrated bar. *Keller,* 496 U.S. at 13–14, 110 S.Ct. 2228. While the Regents do not address this prong,[9] throughout this appeal the Regents have focused on their interest in education. The Regents also speak of the government's interest in shared governance, or in other words the interest in allowing

students to share in the running of the Wisconsin University System.

No doubt there is a vital interest in education, and the government has an interest in allowing students to share the governance of the university system (although whether the latter interest is also "vital" is not clear). However, for the vital policy interest to survive scrutiny under *Lehnert,* it must justify *compelled* funding of the private or quasi-private activity. Neither of these interests presents a vital interest in *compelling* students to fund private organizations which engage in political and ideological speech. Again, *Lehnert,* 500 U.S. at 521, 111 S.Ct. 1950, illustrates this.

In *Lehnert* non-union members challenged various union expenditures, including "lobbying activities related not to the ratification or implementation of a dissenter's collective-bargaining agreement, but to financial support of the employee's profession or of public employees generally...." *Id.* at 522, 111 S.Ct. 1950 (plurality). In determining the constitutionality of these expenditures, a plurality of the Court analyzed the vital policy interests involved—labor peace and preventing free riders—and concluded "[l]abor peace is not especially served by ... charging objecting employees for lobbying, electoral and other political activities that do not relate to their collective-bargaining agreement." *Id.* at 521, 111 S.Ct. 1950. *Lehnert* further explained that labor peace would not be furthered: "[B]ecause worker and union cannot be said to speak with one voice, it would not further cause harmonious industrial relations to compel objecting employees to finance union political activities as well as their own." *Id.*

While labor peace is not at issue here, the above quotation illustrates the importance of a common cause for justifying the compelled funding. In the context of union cases,

---

8. The Regents also cite *Hays County Guardian v. Supple,* 969 F.2d 111, 123 (5th Cir.1992), and *Kania v. Fordham,* 702 F.2d 475, 481 (4th Cir. 1983). These cases held that a university could constitutionally fund student newspapers with mandatory student activity fees. We need not consider the correctness of those decisions because the plaintiffs have not challenged the funding of the student newspaper.

9. The Regents fail to consider the latter two prongs of *Lehnert* (arguably waiving the argument—in fact the Regents do not even cite *Lehnert* in their briefs on appeal). We nonetheless proceed with this analysis, as set forth by the Supreme Court.

where the union and nonunion members share a common cause, a vital policy interest justified the compelled funding. But where that was missing, the expenditure could not be justified. In this case while there may be a common cause in education and shared governance, there is no common cause between private organizations which engage in political and ideological speech and the objecting students. Thus, we see no vital policy interest supporting compelled funding of the private associations. And we might even conclude that far from *serving* the school's interest in education, forcing objecting students to fund objectionable organizations undermines that interest. In some courses students are likely taught the values of individualism and dissent. Yet despite the objecting students' dissent they must fund organizations promoting opposing views or they don't graduate.

The Regents also speak of a "free-rider" problem, claiming that because private organizations must open their activities to all students, allowing objecting students to withhold funding would result in a free-rider problem similar to that acknowledged as a vital policy interest in *Abood*. Where, as here, the Regents' own policy allows nonstudents to join registered student organizations and attend campus activities, they cannot legitimately claim a concern over free riders. Most student organizations subject to this open-access policy receive no funds. Free riders might more accurately describe those organizations that receive a share of the mandatory fees.

Even if objecting students were labeled free riders, the basis underlying the free-rider concern in *Abood* is absent here. In *Abood*, in holding that an employee's free speech rights are not unconstitutionally burdened because the employee opposes positions taken by a union in its capacity as collective-bargaining representative, the Court clearly recognized that to hold otherwise would create a free-rider problem. The *reason* a free-rider problem exists in the

context of unions, however, is significant (and in the case of student organizations lacking): In the case of unions, the government has imposed on unions the duty to fairly represent all employees, including those who do not belong to the union, and these legal requirements "often entail expenditure of much time and money." 431 U.S. at 221, 97 S.Ct. 1782. Forcing non-union employees to fund the union's collective bargaining agreement thus "counteracts the incentive that employees might otherwise have to become free riders—to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees." *Id.* at 222, 97 S.Ct. 1782.

Conversely, here the private organizations which the plaintiffs object to funding do not act in a representative capacity for the students and have no obligation to fairly represent the students, as the union does for nonunion members. Rather, the private organizations' advocacy and speech further positions espoused by the organizations and their members. The political and ideological activities of private organizations are not limited to the university setting, and have ramifications that extend into the diverse aspects of the student's life. In fact, many of the ideological and political activities and speech to which the plaintiffs object occurred off-campus, further limiting the benefit to objecting students. These differences make the free-rider concern inapplicable here.[10] *See also Ellis*, 466 U.S. at 452, 104 S.Ct. 1883 (holding that the union could not force nonunion employees to fund the recruitment of workers outside the bargaining unit because it did not implicate a free-rider concern: "the free rider Congress had in mind was the employee the union was required to represent and from whom it could not withhold benefits obtained for its members. Nonbargaining unit organization is not directed at the employee."); *Lehnert*, 500 U.S. at 521, 111 S.Ct. 1950 (rejecting union's free-rider justification for lobbying expenditures, holding that the

---

10. The Regents also seem to argue that because all students benefit from "robust debate," the objecting students are also free riders. While arguably non-speakers benefit from the additional speech, that is not enough: "[P]rivate speech often furthers the interests of nonspeakers, and that does not alone empower the state to compel the speech to be paid for." *Lehnert*, 500 U.S. at 556, 111 S.Ct. 1950 (Scalia, concurring).

free-rider concern is inapplicable because "[t]he balancing of monetary and other policy choices performed by legislatures is not limited to the workplace but typically has ramifications that extend into diverse aspects of an employee's life.").

### 3. Burdening of free speech.

Even if the Regents could satisfy the first and second prongs, they cannot satisfy *Lehnert*'s third and final prong by proving that the forced funding does not "significantly add[ ] to the burdening of free speech inherent in achieving those interests." This prong recognizes that any time the government forces individuals to fund private organizations, a burden on free speech and association may incidentally result, but that burden may be justified by an important governmental interest. Assuming there is a vital governmental interest in funding (which we have concluded there is not), the question then becomes whether a specific expenditure adds to the burden on speech inherent in the mandated funding of the organization in the first instance. If it does, funding those expenditures cannot constitutionally be required even if it is germane to an organization's mission.

In determining whether using compelled fees to fund a private organization which engages in political and ideological activities "significantly adds to the burdening of free speech," we are again guided by *Lehnert*. In *Lehnert*, the Court held that funding political lobbying and using objecting employees' funds to garner public support "present[s] additional 'interference with the First Amendment interests of objecting employees.' " 500 U.S. at 521–22, 111 S.Ct. 1950 (internal citation omitted). In doing so, the Court explained:

> [t]he burden upon freedom of expression is particularly great where, as here, the compelled speech is in a public context. By utilizing petitioners' funds for political lobbying and to garner the support of the public in its endeavors, the union would use each dissenter as "an instrument for fostering public adherence to an ideological point of view he finds unacceptable." [*Wooley v.*] *Maynard*, 430 U.S. 705, 715, 97

S.Ct. 1428, 51 L.Ed.2d 752 (1977). The First Amendment protects the individual's right of participation in these spheres from precisely this type of invasion. Where the subject of compelled speech is the discussion of governmental affairs, which is at the core of our First Amendment freedoms, the burden upon dissenters' rights extends far beyond the acceptance of the agency shop and is constitutionally impermissible.

*Id.* at 522, 111 S.Ct. 1950 (plurality). The Court further explained that "[a]lthough First Amendment protection is in no way limited to controversial topics or emotionally charged issues, the extent of one's disagreement with the subject of compulsory speech is relevant to the degree of impingement upon free expression that compulsion will effect." *Id.* at 521–22, 97 S.Ct. 1428.

If there was any doubt, *Lehnert* makes clear that the Regents' policy cannot stand. Here the burden on objecting students' speech "is particularly great"; the private organizations use the funds to "garner the support of the public in its endeavors," and as "an instrument for fostering public adherence to an ideological point of view" which the students find objectionable. "The degree of impingement upon free expression that the compulsion will effect" is also especially severe given the extent and source of the students' disagreement with the speech engaged in by the organizations which receive their fees. In this case, the speech to which the plaintiffs object includes such emotionally charged issues as abortion, homosexuality, and the United States' democratic system. The source of the plaintiffs' disagreement, as explained at length in their affidavits, is their deeply held religious and personal beliefs.

Notwithstanding these deep-seated beliefs, the Regents attempt to justify forcing the objecting students to fund these organizations because without funding less speech will result, and less controversial speech, and according to the Wisconsin Assistant Attorney General at oral argument, "hateful speech has a place in our society too." That may well be true, but the Constitution does not mandate that citizens pay for it. *See Regan v. Taxation With Representation of*

*Wash.*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) ("Although TWR does not have as much money as it wants, and thus cannot exercise its freedom of speech as much as it would like, the Constitution 'does not confer an entitlement to such funds as may be necessary to realize all the advantage of that freedom.' "). *See also,* Thomas Jefferson, Notes on the State of Virginia 233 (2d Amer.ed., 1794) ("[I]t is error alone which needs the support of government. Truth can stand for itself."). In fact it guarantees the opposite—that "we the people" will not be compelled to pay for such speech: "[T]o compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." *Abood,* 431 U.S. at 234–35 n. 31, 97 S.Ct. 1782 (quoting Irving Brant, *James Madison: The Nationalist* 354 (1948)). Yet that is exactly what the Regents do, and to support this policy they again point to the educational benefits flowing from the very speech to which the plaintiffs so strenuously object. That by its nature is an interest in the compelled funding of private speech, which "significantly adds to the burdening of free speech." [11]

One of the Supreme Court's more recent compelled-funding cases, *Glickman v. Wileman Bros. & Elliott,* —— U.S. ——, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997), confirms our conclusion. In *Glickman,* a number of growers, handlers, and processors ("respondents") of California tree fruits challenged the constitutionality of various regulations contained in marketing orders which the Secretary of

Agriculture promulgated pursuant to the Agricultural Marketing Agreement Act of 1937. The orders at issue imposed assessments on the respondents that covered the costs of administrative expenses and included the cost of generic advertising of California nectarines, plums, and peaches. The respondents argued to the Supreme Court that compelled funding of such generic advertising abridged their First Amendment rights. In a 5–4 decision, the Supreme Court upheld the marketing orders. In upholding the assessment, the Supreme Court relied on

> three characteristics of the regulation scheme at issue to distinguish it from laws that [the Court has] found to abridge the freedom of speech protected by the First Amendment. First, the marketing orders impose no restraint on the freedom of any producer to communicate any message to any audience. Second, they do not compel any person to engage in any actual or symbolic speech. Third, *they do not compel the producers to endorse or to finance any political or ideological views.* (Citing *Abood* and *Keller.*)

*Id.* at 2138.

The third characteristic, that the assessment does "not compel the producers to endorse or to finance any political or ideological views," *id.,* proved of the utmost significance to the Court's ruling. Throughout its opinion, the Court reiterated the last distinction—that the orders "do not compel the producers to endorse or to finance any political or ideological views." *See, e.g., id.* at

---

11. The compulsion which Madison condemned is of heightened concern following *Rosenberger,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), because under Rosenberger it would seem that if the university opens up funding to private organizations it must fund not only the Socialists and the Greens, but the Republicans, the Democrats, the KKK, Nazis, and the skinheads; the Nation of Islam, the Christian Coalition, and Catholic, Protestant, Jewish, and Islamic organizations. To others, this engenders a "crisis of conscience." For example, when a Christian campus group sought an ASM operations grant, the Ten Percent Society opposed it, contending that it would be illegal and unconstitutional to fund the proselytizing and anti-homosexual advocacy of this Christian organization.

If the university cannot discriminate in the disbursement of funds, it is imperative that stu-

dents not be compelled to fund organizations which engage in political and ideological activities—that is the only way to protect the individual's rights. The Regents themselves recognized this important First Amendment concern in passing the University of Wisconsin Financial Policy and Procedure Paper No. 20 which prohibited the use of student activities fees to fund "activities that are politically partisan or religious in nature." As the Regents explained in their reply brief: "The UW–Madison, like the University of Virginia whose policy was challenged in *Rosenberger,* believed at the time that the policy was adopted that it was required to protect students' rights under the First Amendment." The Regents properly recognized the need to protect objecting students' rights under the First Amendment, and that need still exists following *Rosenberger*—in fact it is now more acute.

2140 (the germaneness test is clearly satisfied because the generic advertising is unquestionably germane to the purposes of the marketing orders and "in any event, the assessments are not used to fund ideological activities."). In fact, the Court used the *absence* of political and ideological speech to distinguish *Abood*:

> However, *Abood*, and the cases that follow it, did not announce a broad First Amendment right not to be compelled to provide financial support for any organization that conducts expressive activities. Rather, *Abood* merely recognized a First Amendment interest in not being compelled to contribute to an organization whose expressive [activities] conflict[ ] with one's "freedom of belief." ... Relying on our compelled speech cases, however, the Court found that compelled contributions for political purposes unrelated to collective bargaining implicated First Amendment interests because they interfere with the values lying at the "heart of the First Amendment—the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." (quoting *Abood*, 431 U.S. at 234–35, 97 S.Ct. 1782). Here, however, requiring respondents to pay the assessments cannot be said to engender any crisis of conscience.

*Id.* at 2139.

The very factors the Court used to distinguish *Abood*, however, in this case compel the opposite result. The students, like the objecting union members in *Abood*, have a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflict with one's "freedom of belief." *Glickman*, —— U.S. at ——, 117 S.Ct. at 2139. And here, unlike *Glick-*

*man*, requiring the students to pay the mandatory student activity fees does engender a crisis of conscience. *Glickman*, 117 S.Ct. at 2130. Finally, in the words of the *Glickman* Court: "compelled contributions for political purposes ... implicated First Amendment interests because they interfere with the values lying at the 'heart of the First Amendment[—]the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State.'" *Id.* at 2139 (quoting *Abood*, 431 U.S. at 234–35, 97 S.Ct. 1782).[12] In essence, allowing the compelled funding in this case would undermine any right to "freedom of belief." We would be saying that students like the plaintiffs are free to believe what they wish, but they still must fund organizations espousing beliefs they reject. Thus, while they have the right to believe what they choose, they nevertheless must fund what they don't believe.

The Regents respond with a barrage of arguments, none of which have merit, or merit much attention. First, the Regents contend that the district court improperly applied a mixed strict-scrutiny/germaneness analysis. The district court did intermingle these two tests. However, we review this case de novo and have applied the *Lehnert* analysis, so any error on the district court's part is harmless.[13]

■ The Regents next argue that there is no evidence that the student activity fees were used to fund the actual political or ideological activities the organizations promoted. However, the Supreme Court rejected this argument in *Abood*, 431 U.S. at 237 n. 35, 97 S.Ct. 1782 (holding that "[i]t is plainly not an adequate remedy to limit the use of the actual dollars collected from dissenting employees to collective-bargaining pur-

---

**12.** In *Glickman*, four justices concluded that the First Amendment protects against the government compelling individuals to fund private speech *whether or not the speech at issue is political or ideological.* —— U.S. at ——, 117 S.Ct. at 2157 (Souter, dissenting). So in *Glickman*, all nine justices rejected as unconstitutional the compelled funding of political and ideological views.

**13.** Conversely, the plaintiffs assert that strict scrutiny is the correct standard of review. However, because the plaintiffs win under the *Lehnert* analysis, the plaintiffs cannot complain as to the standard of review. Moreover, while the *Lehnert* analysis derived by the Supreme Court from *Abood* and *Keller* appears to be the appropriate test (as recognized by *Rosenberger*), we note that the Regents' policy also cannot survive the more exacting strict scrutiny standard.

poses"). Therefore, whether or not the student fees directly fund the political or ideological activities is irrelevant; the First Amendment is offended by the Regents' use of objecting students' fees to subsidize organizations which engage in political and ideological activities. This also means that the Regents cannot earmark the objecting students' activity fees to fund non-political organizations and then continue to distribute the same amount of funding to the political and ideological organizations albeit with funds in "name" paid by non-objecting students. This too is merely a bookkeeping matter, with the end result being that the objecting student subsidizes the political and ideological activities of the organization. *Abood,* 431 U.S. at 237 n. 35, 97 S.Ct. 1782. The dollars are fungible and splitting the same amount in two directions does not cure the obvious subsidy.

The Regents next argue that because the organizations do not purport to speak for all students, the First Amendment is not violated. This is irrelevant. The First Amendment protects the right to free speech and the corresponding right not to be compelled to fund private speech. These rights are premised on an individual's freedom to say what he wants to say and conversely not say what he does not want to say. It matters not whether a third party attributes the private organization's political and ideological views to the objecting student.

■ The Regents also attempt to distinguish this case from *Abood* and *Keller* by arguing that here the objecting students can work through the democratic process, whereas in the union and bar association cases that remedy was not available. While it is true that the teachers in *Abood* were not members of the union, and therefore did not have a role in electing union leaders, in *Keller* the objecting attorneys were required to be members of the state bar association and therefore were able to work within the democratic system. Given that *Keller* did not distinguish itself from *Abood* on this basis,

we won't either. Actually, there is a more basic flaw in the Regents' reliance on the democratic nature of student representation: The First Amendment trumps the democratic process and protects the individual's rights even when a majority of citizens wants to infringe upon them.[14]

■ Finally, the Regents rely on *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and *Libertarian Party of Indiana v. Packard,* 741 F.2d 981 (7th Cir.1984), to argue that as the government they can use the student activity fees to fund private organizations even if those organizations engage in political and ideological activities and speech. However, both those cases involved the legislature's appropriation of public funds raised through taxation. In *Buckley,* Congress appropriated income tax revenue to fund political organizations, while in *Libertarian Party* Indiana's legislature appropriated money generated by what in effect constituted a sales tax. 741 F.2d at 990. The student activity fee, however, does not equate to a tax. *Rosenberger* made this clear, stating that "the $14 paid each semester by the students is not a general tax designed to raise revenue for the University.... Our decision, then, cannot be read as addressing an expenditure from a general tax fund." *Rosenberger,* 515 U.S. at 841, 115 S.Ct. 2510. See also, 515 U.S. at 851–52, 115 S.Ct. 2510 (O'Connor, concurring) ("The Student Activities Fund, then, represents not government resources, whether derived from tax revenue, sales of assets, or otherwise, but a fund that simply belongs to the students."). Therefore, *Buckley* and *Libertarian Party* are inapposite.

In sum, we conclude that the *Abood* and *Keller* analysis, as explained in *Lehnert,* governs the students' First Amendment challenge of the Regents' mandatory student fee policy. The Regents have failed to sustain their burden under this three-prong analysis; even if funding private political and ideological organizations is germane to the university's mission, the forced funding of such orga-

---

**14.** Also, what good does it do objecting students to work within the democratic process? Even if the objecting students run for, or obtain representation on the ASM, once there they cannot defund organizations whose viewpoint they opposed. *Rosenberger,* 515 U.S. at 833, 115 S.Ct. 2510.

nizations significantly adds to the burdening of the students' free speech rights. Therefore, the Regents cannot use the allocable portion of objecting students' mandatory activity fees to fund organizations which engage in political or ideological activities, advocacy, or speech. We also hold that the 18 challenged private organizations engage in ideological and political activities and speech, and cannot be constitutionally funded with objecting students' fees.[15]

## B. Injunctive Relief

■ The district court ordered "that the defendants, their officers, employees and other agents shall forthwith cease the funding of private groups that engage in ideological or political advocacy." The district court further ordered that the Regents publish written notice of organizations engaging in political or ideological speech, and the pro rata share of mandatory fees devoted to these organizations, and that the Regents establish an arbitration proceeding for disputes over the amount of fees paid and the nature of the organizations involved.

In issuing the injunction, the district court properly rejected the Regents' proposed procedure for compliance—a refund mechanism. In *Ellis,* 466 U.S. at 443–45, 104 S.Ct. 1883, the Supreme Court held (in the union context) that a pure rebate approach inadequately protects the constitutional rights of objecting employees:

> By exacting and using full dues, then refunding months later the portion that it was not allowed to exact in the first place, the union effectively charges the employees for activities that are outside the scope of the statutory authorization. The cost to the employee is, of course, much less than if the money was never returned, but this

is a difference of degree only. The harm would be reduced were the union to pay interest on the amount refunded, but respondents did not do so. Even then the union obtains an involuntary loan for purposes to which the employee objects.

In arguing in support of the refund mechanism, the Regents assert various administrative problems, and contend that it will be impossible to determine the appropriate refund, given that each year the student government determines the level of funding of various activities. But these same administrative burdens face unions and bar associations, and yet the Supreme Court has refused to allow a rebate system to stand: "The only justification for this union borrowing would be administrative convenience.... Given the existence of acceptable alternatives, the union cannot be allowed to commit dissenters' funds to improper uses even temporarily." *Id. See also, Hudson,* 475 U.S. at 305, 106 S.Ct. 1066 ("[A] remedy which merely offers dissenters the possibility of a rebate does not avoid the risk that the dissenters' funds may be used temporarily for an improper purpose.... For, whatever the amount, the quality of respondents' interest in not being compelled to subsidize the propagation of political or ideological views that they oppose is clear.").[16]

But we agree with the Regents that the order is overbroad in some respects. The district court's order enjoining the university from "funding private groups that engage in ideological or political advocacy" applies to both objecting students and non-objecting students, but the plaintiffs pursued only a challenge to contributions made with objecting students' fees. Similarly, the district court's mandate that the Regents "may use mandatory segregated fees *only* for activities

---

15. As a result of our decision, we need not consider what the association clause of the First Amendment would add to the students' claim. We also need not consider the plaintiffs' free exercise claim, which was dismissed by the district court as moot.

16. *Hudson* also made clear that nonmembers must be provided adequate information about the basis for the proportionate share, and "given sufficient information to gauge the propriety of the union's fee," and that the union must provide

for a reasonably prompt decision by an impartial decision maker concerning the propriety of the fees. Recently, the Supreme Court reaffirmed these procedural protections in *Air Line Pilots Association v. Miller,* —— U.S. ——, 118 S.Ct. 1761, 140 L.Ed.2d 1070 (1998), while also holding that objectors need not exhaust an arbitration remedy before bringing claims in a federal court, unless they had agreed to do so. These same constitutional requirements apply equally to the University of Wisconsin.

reasonably intended to promote its educational mission by providing opportunities and fora for the free expression of diverse viewpoints," fails to limit itself to those fees paid by objecting students. Moreover, the plaintiffs in this case did not argue that the Regents cannot use *any* mandatory segregated fees to fund student activities—they only objected to the use of objecting students' fees, and then only to fund organizations which engage in their own political and/or ideological speech, activities, and advocacy. They did not object to the use of student fees to fund services or student activities which do not involve political or ideological speech and advocacy. Because this portion of the injunction, as worded, goes too far, it cannot stand.[17]

The injunction also establishes rather detailed and specific procedures which the Regents must undertake to administer the distribution of mandatory student activity fees. While it is appropriate to issue an injunction stating what the state cannot do, federalism requires caution in ordering states what to do. We recognized this point in *ACORN v. Edgar*, 56 F.3d 791, 797 (7th Cir.1995). In *ACORN*, the district court entered an injunction which enjoined state officials from refusing to comply with the law, but also set forth specific details in the form of a mandatory injunction. We concluded that the injunction "failed to exhibit an adequate sensitivity to the principle of federalism," *id.* at 798, explaining that "federal judicial decrees that bristle with interpretive difficulties and invite protracted federal judicial supervision of functions that the Constitution assigns to state and local government are to be reserved for extreme cases of demonstrated noncompliance with milder measures." *Id.* We then reversed the injunction stating that "until it appears that the state will not comply with [an injunction commanding compliance with the law], there is no occasion for the entry of a complicated decree that treats the state as an outlaw and requires it to do even more than the 'motor voter' law re-

quires." In other words, detailed mandatory injunctions "are last resorts, not first." *Id.*

▮▮▮ Moreover, "[w]hile a district court has wide discretion in fashioning a remedial injunction, such discretion is not without constraints. Prominent among these restraints is the principle of federalism: 'federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs....'" *Consumer Party v. Davis*, 778 F.2d 140, 146 (3d Cir.1985). Considerations of comity and federalism require that injunctive relief against a state be no broader than necessary to remedy the constitutional violation. *Lewis v. Casey*, 518 U.S. 343, 362–63, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). *See also Clark v. Coye*, 60 F.3d 600, 604 (9th Cir.1995) ("[I]n reviewing a district court's injunction against an agency of state government, we scrutinize the injunction closely to make sure that the remedy protects the plaintiffs' federal constitutional and statutory rights but does not require more of state officials than is necessary to assure the compliance with federal law."); *Toussaint v. McCarthy*, 801 F.2d 1080, 1087 (9th Cir.1986) ("[I]njunctive restraints that exceed constitutional minima must be narrowly tailored to prevent repetition of proved constitutional violations, and must not intrude unnecessarily on state functions."). This is especially true in the context of education, which by its very nature is a local concern.

The district court's injunction went much further than enjoining the Regents from using objecting students' mandatory activity fees to fund organizations which engage in political and ideological activities—the injunction set forth detailed measures which the Regents must undertake. Because the Constitution does not mandate this exact procedure, and because the state has not yet refused to comply with a general negative injunction—saying what the State cannot do—paragraphs two through five of the injunction cannot stand.

---

**17.** The declaratory judgment likewise included this overbroad language, and to the extent it is inconsistent with our holding today, it is also vacated. For clarity, we again stress that the fees need not be directly used for the political or

ideological activities; the Regents cannot use the objecting students' funds to subsidize organizations which engage in political and ideological activities.

In addition to the above issues regarding the injunction, the plaintiffs contend that the injunction should have specifically provided that each individual student, and not the University, "must have the final decision as to whether to fund an advocacy group or not before any fees are paid to the University," and that "[t]he University may not define private groups' advocacy as a 'service' to other students in order to require students to fund those groups." We do not think that the district court erred by failing to specifically state the above. However, we reiterate that under our holding above, the University cannot even temporarily collect from *objecting* students the portion of the fees which would fund organizations which engage in political and ideological activities, speech, or advocacy, whether or not the organization also provides some a service in doing so.

## III. CONCLUSION

Under the *Lehnert* analysis, the Regents' mandatory student fee policy cannot stand. Funding of private organizations which engage in political and ideological activities is not germane to a university's educational mission, and even if it were, there is no vital interest in compelled funding; and the burden on the plaintiffs' First Amendment right to "freedom of belief" outweighs any governmental interest. We therefore hold that the Regents cannot use the allocable portion of objecting students' mandatory activity fees to fund organizations which engage in political or ideological activities, advocacy, or speech, and they are hereby enjoined from doing so. The Regents, however, are free to devise a fee system consistent with our opinion and Supreme Court precedent; we will not mandate one at this time.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART.