of Oregon; David Frohnmayer; Gerald Mosley; Oregon Public Interest Research Group, Defendants–Appellees.

No. 97–35189.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 5, 1998.

Decided Feb. 23, 1999.

Owen Brennan ROUNDS; H.E. Friedrich Von Carp; Charles Dye; Harrison Lynch; Ed Matthews; Students for Legal Government, Plaintiffs–Appellants,

v.

OREGON STATE BOARD OF HIGHER EDUCATION; Thomas Bartlett; Robert Bailey; Robert Adams; Britteny Davis; Mark Dodson; Richard Donahue; Beverly Jackson; Rob Miller; George Richardson, Jr.; Laurie Yokota; University

Thomas H. Nelson, Jeffrey S. Lovinger, and Zaha S. Hassan, Portland, Oregon, for the plaintiffs-appellants.

David Schuman, Deputy Attorney General, and Virginia L. Linder, Solicitor General, for the state defendants-appellees.

David C. Vladeck, Colette G. Matzzie, and Alan B. Morrison, Public Citizen Litigation Group, for defendant-appellee Oregon Student Public Interest Research Group Education Fund.

Before: HAWKINS, THOMAS, and SILVERMAN, Circuit Judges.

THOMAS, Circuit Judge:

In this appeal, we consider whether the University of Oregon violated the plaintiffs' free speech and associational rights by requiring them, as a condition of matriculation, to pay incidental fees that contributed to the support of the Oregon Student Public Interest Research Group Education Fund. We hold that the plaintiffs' First Amendment rights were not violated, and affirm the judgment of the district court.

## I

This lawsuit targets the funding of the Oregon Student Public Interest Research Group Education Fund (the "OSPIRG EF") through incidental fees (the "Fees") that students must pay to matriculate. The Fees are paid into a general fund that is then distributed to student programs following a detailed budgetary review process. The plaintiffs, including former or current students at the Eugene campus of the University of Oregon (the "University"), and Students for Legal Government, an unincorporated association of University students, (collectively, the "Students"), instituted this action to enjoin the University from allocating funds from the Fees to the OSPIRG EF, to obtain a declaratory judgment holding that this use of the Fees is unconstitutional and illegal, and to secure a refund of the portion of their Fees that the OSPIRG EF received in previous years. The Students seek relief under the First and Fourteenth Amendments to the United States Constitution, pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983.

Oregon statutory law authorizes the imposition of the Fees to finance programs "under the supervision or control" of the Oregon State Board of Higher Education (the "Board of Higher Education") that the latter deems "to be advantageous to the cultural or physical development of students." Or.Rev. Stat. § 351.070(3)(d) (1997). Over eighty University organizations, including athletic, culturally-oriented, and political groups, received funding from the Fees during the 1995–96 academic year.

Among the groups that received funding was the OSPIRG EF, a statewide organization run entirely by students to address issues of concern to students. With member chapters on the campuses of the University, Lane Community College, Portland State University, and Lewis and Clark College, the OSPIRG EF is a nonpartisan organization funded entirely by student activity fees that aims to develop students' potential to become educated and responsible citizens who are informed about the American legislative process and political system. Towards this end, the OSPIRG EF offers students the opportunity to explore public policy issues, partici-pate in extra-curricular activities, organize and engage in community service efforts, and acquire leadership skills. Although students are responsible for running and governing the OSPIRG EF at both the local and the state levels, a paid professional staff is available to assist the student workforce.

On May 2, 1995, the Students filed suit in the United States District Court for the District of Oregon. As defendants, the Students named the University, the Board of Higher Education, the Associated Students of the University of Oregon, (the "Associated Students"), and the OSPIRG EF, as well as several University and Board of Higher Education officials in both their official and individual capacities. Subsequently amending their complaint on May 11, 1995, to include additional individual state officials, the Students asserted the following three claims for relief: a violation of their rights under the First and Fourteenth Amendments pursuant to 42 U.S.C. §§ 1983, 1985(3); a violation of their rights under various sections of Article I of the Oregon Constitution; and a violation of Oregon statutory law. Following extensive discovery, the Students moved for summary judgment. In response, both the state defendants and the OSPIRG EF moved for summary judgment on the same day.

On October 3, 1996, a magistrate judge entered a recommendation of dismissal in favor of the defendants. Hence, he recommended that the district court: (1) grant the state defendants' motion for summary judgment on the Students' federal claim; (2) deny the Students' motion for summary judgment; (3) dismiss the state law claims without prejudice to refile in state court; (4) deny as moot the OSPIRG EF's motion for summary judgment, as the only claim against the OSPIRG EF was the soon-to-be-dismissed state statutory claim; and (5) dismiss the action. The district court adopted the magistrate judge's recommendation on December 12, 1996, and entered its judgment of dismissal on December 16, 1996.

In their timely appeal, the Students assert only their federal constitutional claim under

42 U.S.C. § 1983.[1] We review the district court's judgment de novo, *see Everson v. United States*, 108 F.3d 234, 236 (9th Cir. 1997), and affirm.

## II

A threshold issue in this case is whether all or some of the defendants are immune from suit under the Eleventh Amendment. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," U.S. Const. amend. XI, and represents "a real limitation on a federal court's federal-question jurisdiction," *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 270, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997).

### A

■ Previously, we have specifically found that the Board of Higher Education is immune from suit under 42 U.S.C. § 1983: "There is no doubt that suit under [§ ] 1983 against the [Oregon] State Board of Higher Education is a suit against the state *qua* state and is, therefore, barred by the Eleventh Amendment." *Peters v. Lieuallen*, 693 F.2d 966, 970 (9th Cir.1982).

■ To determine whether the University enjoys Eleventh Amendment immunity, we must look to its nature as created by state law. *See Regents of the Univ. v. Doe*, 519 U.S. 425, 429–30 & n. 5, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997); *Mitchell v. Los Angeles Community College Dist.*, 861 F.2d 198, 201 (9th Cir.1988). Oregon statutory law subjects the University to the jurisdiction of the Board of Higher Education, and requires the president of the University to act under the

Board of Higher Education's supervision. *See* Or.Rev.Stat. §§ 352.002, 352.004 (1997); *see also McClain v. Regents of the Univ.*, 124 Or. 629, 265 P. 412, 413 (1928) (en banc) ("The University of Oregon is a state institution. It is not an independent legal entity.").

Another factor we must consider in our inquiry is whether the University performs central governmental functions. *See Mitchell*, 861 F.2d at 201. Under the control of the Board of Higher Education, the University performs the central governmental function of providing opportunities for "deserving and qualified citizens to realize their aspirations for higher education," Or.Rev.Stat. §§ 351.003, 351.005, thereby meeting Oregon's needs for "wise and effective leadership and an informed citizenry," *id.* § 351.001. Thus, the University is an arm of the State of Oregon for Eleventh Amendment immunity purposes.

■ Neither the University nor the Board of Higher Education has waived this Eleventh Amendment immunity. On the contrary, in their joint answer during the proceedings below, the University and the Board of Higher Education expressly alleged that they were entitled to Eleventh Amendment immunity. Nor has Congress unilaterally abrogated Oregon's Eleventh Amendment immunity, as the United States Supreme Court has recognized that "Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The Eleventh Amendment therefore bars suit against the University and the Board of Higher Education alike. To the extent that the Students assert a § 1983 claim against the Associated Students, this claim also is barred, as the Associated Stu-

---

1. Because the only claim asserted on appeal is the Students' section 1983 claim, we decline to impose liability upon the OSPIRG EF or its directors for any violation of the Students' constitutional rights. In asserting a section 1983 claim against the OSPIRG EF in this appeal, the Students ignore the claims for relief they brought in their own complaint. The claim they pursued against the OSPIRG EF involved OSPIRG EF's purported violation of title 30, section 351.070 of the Oregon Revised Statutes, a claim which they

no longer pursue here. Although the Students supplemented their briefs on appeal by asking (1) that we find that OSPIRG EF acted under color of state law, or (2) that we exercise our equitable power to remedy an alleged wrong, we regard these claims as waived rather than allow the Students to raise entirely new legal claims against the OSPIRG EF at this juncture. *See Han v. United States*, 944 F.2d 526, 527 n. 1 (9th Cir.1991).

dents' status as the recognized student government at the University allows it to claim the same Eleventh Amendment immunity that shields the University itself.

■ The Students assert that the University and the Board of Higher Education enjoy no such immunity from liability for non-monetary relief. This argument defies the United States Supreme Court's observation that the Eleventh Amendment's jurisdictional bar applies "regardless of the nature of the relief sought." *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Thus, the Eleventh Amendment immunity that the University and the Board of Higher Education may claim as dependent instrumentalities of Oregon shields them from claims for both monetary and non-monetary relief.

The Students may pursue neither their monetary nor their equitable claims for relief against the University, the Board of Higher Education, or the Associated Students.

### B

■ The Eleventh Amendment does not bar the Students' claim for declaratory and injunctive relief against the individual defendants, sued in their official capacities, who have responsibility for the administration of the Fees.[2] *See Native Village v. Blatchford,* 38 F.3d 1505, 1511 (9th Cir.1994); *see generally Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *Ex Parte Young* provided a narrow exception to Eleventh Amendment immunity for certain suits seeking declaratory and injunctive relief against unconstitutional actions taken by state officers in their official capacities. *See* 209 U.S. at 155–56, 28 S.Ct. 441. Thus, the Eleventh Amendment does not preclude us from considering the Students' claims for injunctive and declaratory relief against the state officials.[3]

### III

Two of our most cherished American freedoms are the right to speak freely and the right to associate with others for the purpose of advancing ideas. Just as precious are the concomitant rights to refrain from speaking and to refuse association with those who articulate contrary views. When a state compels association and authorizes mandatory exactions from organization members, individual freedom of speech and association may be affected when the association speaks for its members. In this case, the Students argue that the collection of the Fees as a condition of their matriculation at a State institution and the distribution of a portion of the proceeds to OSPIRG EF compels them to speak in support of beliefs they do not hold and infringes on their freedom to not associate with an organization with which they strongly disagree.

### A

■ We do not confront these issues in a vacuum, for the Supreme Court has already

---

**2.** Nor does the Eleventh Amendment bar suits against state officials in their individual capacities. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Native Village of Noatak v. Blatchford,* 38 F.3d 1505, 1512 (9th Cir.1994). Plaintiffs, however, may not bring claims against former state officials in their official capacity, as suits against state officials are in essence suits against the State. *See Hafer,* 502 U.S. at 25, 112 S.Ct. 358. Additionally, plaintiffs suing state officials in both their official and individual capacities must allege a connection between the state official and the allegedly unconstitutional action. *See Ex parte Young,* 209 U.S. 123, 157, 28 S.Ct. 441, 52 L.Ed. 714 (1908) ("In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party."); *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989) (requiring a similar connection in § 1983 suits against state officials in their individual capacities for monetary damages).

**3.** In this case, it is apparent from the face of the record that many, if not most, of the individually named defendants lack the requisite causal connection under *Young* and *Taylor.* Some defendants also may have legislative immunity under *Bogan v. Scott–Harris,* 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998), or qualified immunity under *Cohen v. San Bernardino Valley College,* 92 F.3d 968, 972–73 (9th Cir.1996), *cert. denied,* 520 U.S. 1140, 117 S.Ct. 1290, 137 L.Ed.2d 364 (1997). However, given the resolution of this case on the merits, it is unnecessary for us to remand for examination of individual immunity.

constructed the analytical framework for our examination. When a state compels association among individuals and imposes mandatory exactions, expenditures therefrom for ideological activities must be "germane to the purpose for which the compelled association was justified." *Keller v. State Bar*, 496 U.S. 1, 13, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990) (internal quotation marks omitted). Thus, the Supreme Court has held unconstitutional the use of compulsory union dues for political purposes unrelated to a union's role as the exclusive bargaining representative for public school teachers. *See Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235–36, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Similarly, the Court has instructed that unified state bar associations, the membership in which is required as a condition of practicing law, may not constitutionally fund "activities of an ideological nature" unrelated to the "State's interest in regulating the legal profession and improving the quality of legal services." *Keller*, 496 U.S. at 13–14, 110 S.Ct. 2228. The germaneness doctrine of *Abood* does not silence organizational speech; rather, it requires only that ideological activities not germane to an organization's purpose be funded through sources other than compulsory fees. *See* 431 U.S. at 235–36, 97 S.Ct. 1782.

These principles are easily described in theory; application is a more operose task. *See Keller*, 496 U.S. at 15, 110 S.Ct. 2228 ("Precisely where the line falls ... will not always be easy to discern."). Because competing constitutional interests are implicated and significant governmental interests impacted, an intermediate level of scrutiny is appropriate, assessing first the interference with First Amendment rights imposed on those objecting to the expenditures and then determining "whether they are nonetheless adequately supported by a governmental interest." *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 518, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991) (quoting *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks*, 466 U.S. 435, 456, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984)).

Resolution of these questions necessarily involves a fact-intensive inquiry, as exemplified by the conclusions of our sister circuits that differ depending on the specific factual setting. *See Southworth v. Grebe*, 151 F.3d 717 (7th Cir.1998), *reh'g denied*, 157 F.3d 1124 (1998), *and petition for cert. filed*, (U.S. Jan. 25, 1999) (No. 98–1189); *Carroll v. Blinken*, 42 F.3d 122 (2d Cir.1994) ("*Carroll II*"); *Carroll v. Blinken*, 957 F.2d 991 (2d Cir.1992) ("*Carroll I*"); *Galda v. Rutgers*, 772 F.2d 1060 (3d Cir.1985) ("*Galda II*"); *Kania v. Fordham*, 702 F.2d 475 (4th Cir. 1983); *Galda v. Bloustein*, 686 F.2d 159 (3d Cir.1982) ("*Galda I*").

After a careful review of the undisputed facts before us and the magistrate judge's thoughtful and thorough analysis of them, we conclude that the distribution of a portion of the Fees to OSPIRG EF is constitutional.

**B**

It is perhaps most useful, as a prefatory matter, to focus our inquiry by eliminating those issues critical to the resolution of the aforementioned cases, but extraneous to this case. Thus, we note that this is not an instance of compelled membership in an objectionable organization, which the Second Circuit found problematic in *Carroll I*. In *Carroll I*, the Second Circuit disapproved a scheme under which students became "automatic members" of the Public Interest Research Group ("PIRG") at issue merely by enrolling in school and paying the incidental fee. *See* 957 F.2d at 1003. That policy "irredeemably transgressed the proscription against forced association." *Id.* The Oregon system does not suffer from that infirmity because the Students are not compelled to associate with the OSPIRG EF in any way. The Students are not afforded "automatic membership" by paying the Fees, nor are the Students required to participate in OSPIRG EF's activities. Under the Oregon system, the Fees are allocated among scores of campus organizations representing many diverse viewpoints. Membership in any campus organization is elective.

Further, the challenge in this case does not present an instance of compelled personal speech, for no personal speech is

compelled from anyone.[4] No student is required to "confess by word or act" belief in any message, as was the case in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Nor is any student required to act as a courier for an ideological message, as was the case in *Wooley v. Maynard*, 430 U.S. 705, 715, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).

The existence of OSPIRG EF as a funded campus organization does not make the Students themselves couriers of "offensive" political or ideological messages. As the Fourth Circuit stated in a similar challenge to a student newspaper funded by mandatory student fees, the newspaper was not, and was not perceived to be, the official voice of all of the students. *See Kania*, 702 F.2d at 478 n. 6. Likewise, OSPIRG EF is not, and cannot be perceived to be, speaking for all of the students at the University.

Additionally, the nature of the communication in this case is different from the communication at issue in *Abood* and *Keller*. As the Fourth Circuit put it in *Kania:*

> [A distinction] between *Abood* and the present case lies in the nature of the communications funded by the compulsory fees in the two cases. In *Abood*, the plaintiffs alleged that they had no control over the Union's communications, and that these communications were one-sided presentations of the 'Union viewpoint.' The mandatory fees in *Abood*, therefore, enhanced the power of one, and only one, ideological group to further its political goals. In contrast, [the newspaper funded by mandatory student fees] increases the overall exchange of information, ideas, and opinions on the campus.

702 F.2d at 480.

Finally, we must underscore that the Oregon system differs markedly from other state PIRGs whose funding by university students has received judicial scrutiny. Unlike the PIRG at issue in *Galda I* and *Galda II*, Oregon PIRG has separated its educational and political functions. Under the Oregon scheme, the OSPIRG EF is a separate entity from the Oregon State Public Interest Research Group ("OSPIRG"), an organization that does engage in legislative lobbying and more overtly political action. No Fees are allocated to OSPIRG; only OSPIRG EF receives funding. Thus, the Oregon system bisects political and educational functions and limits university funding to educational activities.

### C

■ The central issue in this case is whether the University's allocation of a portion of the Fees to OSPIRG EF is unconstitutional. Although, as we have discussed, this is not a true case of compelled association, the principles of *Abood* and *Keller* remain applicable. Thus, ideological activities funded by the mandatory incidental fee must be "germane" to the purposes for which the compelled association was justified to pass constitutional muster. *See Keller*, 496 U.S. at 13, 110 S.Ct. 2228.

In assessing purpose, it is of the utmost significance that the organizational speech at issue occurs in an academic setting, for "[i]t is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation." *Sweezy v. State*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring) (quoting The Open Universities in South Africa 10–12). Indeed, "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87

---

4. For this reason, contrary to the Students' argument, strict scrutiny is not required. When personal speech is compelled, as in *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), and *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), state action is valid only if it is "a narrowly tailored means of serving a compelling state interest." *Pacific Gas & Elec. Co. v. Public Utils. Comm'n*, 475 U.S. 1, 19, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986). Because mandatory exactions do not involve personal endorsements, such exacting scrutiny is not required. *See, e.g., Keller*, 496 U.S. at 13–14, 110 S.Ct. 2228 (applying a "germaneness" test to ideological speech of compulsory member organizations).

S.Ct. 675, 17 L.Ed.2d 629 (1967) (quoting *United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y.1943)). The goals of the university are much broader than the goals of a labor union or a state bar, and they are inextricably connected with the underlying policies of the First Amendment.

Akin to the student fee at issue in *Rosenberger v. Rector and Visitors,* the Fees support a "broad range of extracurricular student activities that are related to the educational purpose of the University." 515 U.S. 819, 824, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (citation and internal quotation marks omitted). As we have noted, the Fees are authorized by Oregon statute to finance programs the Board of Higher Education deems "to be advantageous to the cultural or physical development of students." Or.Rev.Stat. § 351.070(3)(d) (1997).

The University has developed an elaborate system to ensure compliance. In order to qualify for funding, an organization must first be recognized by the Associated Students. Criteria for recognition includes a requirement that the organization engage in activities of common interest to students. If recognized, the organization may apply for funding by submitting a budget request. Organizations then can receive funding by either approval of a majority vote of the entire student body or through a budget process that includes approval of various committees of the Associated Students as well as the Student Senate. The budget allocation also must be approved by the President of the University and the Board of Higher Education. Consistent with the budgetary restrictions, specific disbursements also are monitored. In order to obtain payment, organizations must submit documentation and a certification that the funds were expended for the purposes authorized by the Associated Students and the University.

Through this process, the University has created a limited public forum, *see Rosenberger,* 515 U.S. at 830, 115 S.Ct. 2510, that encourages "a diversity of views from private speakers," *id.* at 834, 115 S.Ct. 2510. The diverse nature of this limited public forum is evident from the budgets for the years at issue. Over eighty organizations representing a wide range of political and ideological views received funding, including two campus newspapers, the Muslim Student Association, the Jewish Student Union, the African Students Association, the Hong Kong Students Association, Amnesty International, Students for Choice, the Lesbian and Gay Alliance, *Men and Women Against Rape,* the National Lawyers Guild, and a student legal services organization.

In this context, the activities of OSPIRG EF were germane to the University's purpose. The record indicates that OSPIRG EF, in contrast to some other PIRGs, is a non-partisan organization whose objective is to provide college students hands-on experience in recognizing, researching and solving the problems of society. OSPIRG EF does so by sponsoring internships, conferences, workshops, research reports and leadership training. During the relevant period, OSPIRG EF promoted recycling projects, documented toxic waste sites, and published informational pamphlets, such as a renter's handbook and a survey of local financial institutions. Thus, OSPIRG EF's purpose is consistent with a university "atmosphere" in which extracurricular activities constitute "a critical part of campus life." *Widmar v. Vincent,* 454 U.S. 263, 279 n. 2, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (Stevens, J., concurring). Indeed, a university's determination that an organization contributes to the university community is presumptively valid. *See Galda I,* 686 F.2d at 166.

After a thorough examination of OSPIRG EF's activities and a consideration of all of the facts stipulated to by the parties, the magistrate judge specifically held that the organization "does not have programs that do not meet the University's educational objectives." As the magistrate judge further noted, "[p]laintiffs conceded that there clearly is an educational benefit arising from the Education Fund's programs ... and, when asked for something specific in the record indicating a lack of constitutionality, plaintiffs provided nothing persuasive." Accordingly, we agree that OSPIRG EF's activities are germane to the purpose for which the mandatory exaction was imposed as a matter of law and that the distribution of funds to

OSPIRG EF serves a legitimate governmental interest that does not violate the First Amendment.

### D

Our sister circuits have examined similar questions and, as we have observed, reached different conclusions dependent upon the facts presented. We have already referenced *Carroll I*, in which the Second Circuit disapproved of an automatic membership system not at issue in this case. 957 F.2d at 1003. In its subsequent decision in *Carroll II*, the Second Circuit upheld allocations to the New York PIRG generally, but invalidated compelled membership and funding for certain non-germane activities. 42 F.3d at 127–28.

In *Galda I* and *Galda II*, the Third Circuit disapproved of an earmarked mandatory student fee paid directly to the New Jersey PIRG. In doing so, the *Galda II* court carefully distinguished allocations made under the procedure at issue here, namely allocation of a general fee through a budgetary process. 772 F.2d at 1064 ("[W]e do not enter the controversy on whether a given campus organization may participate in the general activities fee despite objections of some who are required to contribute to that fund."). The court further noted that a general student activities fee could be perceived as creating a forum to support diverse viewpoints, but because the New Jersey PIRG mandatory fee was separate from the general student fee, it created a forum that only supported New Jersey PIRG's viewpoints. *Id.* The Third Circuit also held, contrary to the facts of this case, that the educational benefit afforded by the New Jersey PIRG was only incidental and "subordinate to the group's function of promoting its political and ideological aims." *Id.* at 1065.

Here, as we have discussed, the separation of educational and political functions forfends such a result. Indeed, OSPIRG EF, as the magistrate judge noted, "does not engage in activities utilizing professional lobbyists, door to door fundraising, and fuel oil or other cooperatives, nor does it incur administrative costs associated with such programs. Education Fund simply does not engage in activities with such an obvious lack of connection to a university's educational objectives."

These facts also distinguish this case from *Southworth v. Grebe*, a case in which the PIRG at issue funded congressional and state legislative lobbying efforts, distributed campaign literature for individual candidates, and developed a voter's guide ranking political candidates.[5] 151 F.3d at 720.

Thus, our holding is consistent with the Second Circuit's opinions in *Carroll I* and *Carroll II* and the Fourth Circuit's opinion in *Kania*, and not inconsistent with the Third Circuit's decisions in *Galda I* and *Galda II*. The issues prompting the Seventh Circuit's concern in *Southworth* are not present in this case. Indeed, OSPIRG EF would seem to have carefully tailored its organization and program to satisfy objections raised in other challenges.

### IV

In summary, we hold that the Students' claims against the Board of Higher Education, the University, and the Associated Students are barred by the Eleventh Amendment. We deny the Students' claims for declaratory and injunctive relief on the merits because the University funding system does not violate the First Amendment. Because we resolve these issues on the merits, we need not reach the other questions raised in the appeal.

We therefore affirm the judgment of the district court.

AFFIRMED.

---

**5.** We do not pass on the propriety of those activities, nor on the substance of the *Southworth* decision, but simply observe that no such evidence exists in this case. To the extent that *Southworth* holds that a public university may not constitutionally establish and fund a limited public forum for the expression of diverse viewpoints, we respectfully disagree for the reasons previously discussed.